**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────────

RAYMOND L. JACKSON,

                        Petitioner,

        v.                                            9:19-CV-1542
                                                      (DNH/CFH)

MICHAEL CAPRA,
                        Respondent.

───────────────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

RAYMOND L. JACKSON
Petitioner, pro se
15-A-3740
Fishkill Correctional Facility
P.O. Box 1245
Beacon, New York 12508

HON. LETITIA JAMES                      MARGARET A. CIEPRISZ, ESQ.
Attorney for Respondent                 Assistantt Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

**CHRISTIAN F. HUMMEL**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

## I.    INTRODUCTION

Petitioner Raymond L. Jackson ("Petitioner") seeks federal habeas corpus relief

pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  On December 16, 2019, this

action was administratively closed due to Petitioner's failure to properly commence it.

Dkt. No. 2, Order Directing Administrative Closure.  Petitioner was advised if he desired

to pursue this action he must so notify the Court and, within thirty days of the Order,

either (1) pay the filing fee of five dollars; or (2) submit a completed, signed, and properly certified in forma pauperis ("IFP") application.  *Id*. at 2.

Petitioner filed a motion to amend his Petition and stay the instant action.  Dkt. No. 3, Motion to Amend and Stay.  On January 8, 2020, the Court advised Petitioner the action remained closed and sua sponte granted Petitioner an extension of time to comply with the December 16, 2019, Order.  Dkt. No. 4, Text Order.  Petitioner subsequently paid the filing fee and submitted a letter enclosing additional grounds for relief.  Dkt. Nos. 5-6, Letters.

The case was reopened.  Dkt. Entry dated January 27, 2020 (identifying receipt information for the filing fee transaction);  Dkt. No. 7, Text Order (restoring case to the Court's active docket).  On February 6, 2020, after completing an initial review of the petition and subsequently-filed documents, the Court denied Petitioner's request for a stay and ordered Petitioner to file an amended petition.  Dkt. No. 8, Decision and Order. Petitioner filed an amended petition, and the Court directed Respondent to answer. Dkt. No. 9, Amended Petition ("Am. Pet."); Dkt. No. 10, Decision and Order (dated February 27, 2020).

Petitioner submitted a request for appointment of counsel and a renewed motion for a stay.  Dkt. No. 11, Motion.  Respondent opposed Petitioner's motions.  Dkt. No. 13. On March 27, 2020, the Court denied Petitioner's motions and sua sponte granted Petitioner an extension of time clarify his intentions by (1) filing a complete motion to stay, a proper motion to expand discovery, or a combination thereof; or (2) indicating his preference for the case to proceed.  Dkt. No. 14 at 11, Decision and Order.

2

Petitioner subsequently filed a motion (1) seeking additional discovery and expansion of the record, and (2) requesting reconsideration of the Court's decision denying his motions to stay and for the appointment of counsel. Dkt. No. 15, Letter Motion. Respondent opposed both motions. Dkt. No. 16. On April 21, 2020, the Court denied Petitioner's motions and directed Respondent to file an answer. Dkt. No. 17 at 7, Decision and Order.

Petitioner submitted a letter requesting permission to amend his petition. Dkt. No. 20. Petitioner also appealed the undersigned's April 21, 2020, denial of Petitioner's request for additional discovery to the District Court. Dkt. No. 22. Respondent opposed Petitioner's request to amend his petition and appeal of the undersigned's decision. Dkt. No. 25; Dkt. No. 28. On June 15, 2020, Hon. Judge David N. Hurd denied Petitioner's appeal. Dkt. No. 29, Text Order. Petitioner moved for a Certificate to appeal the District Court's denial of his request for discovery to the U.S. Court of Appeals for the Second Circuit. Dkt. No. 30. On July 7, 2020, the District Court denied Petitioner's motion to amend his petition and request for a Certificate of Appealability. Dkt. No. 31 at 9-11, Decision and Order. Petitioner submitted a renewed motion for a Certificate of Appealability, which the District Court denied. Dkt. No. 32, Renewed Motion; Dkt. No. 33, Text Order.

Respondent successfully requested three extensions of time to file a response to the operative pleading– the Amended Petition. Dkt. Nos. 34, 36, 38, Letter Motions; Dkt. Nos. 35, 37, 39, Text Orders. On November 16, 2020, Petitioner filed a motion to stay the proceedings. Dkt. No. 40. Respondent opposed Petitioner's motion. Dkt. No. 43. The undersigned denied Petitioner's motion. Dkt. No. 44 at 5, Decision and Order.

Respondent successfully requested permission to file an oversized memorandum of law. Dkt. No. 45, Letter Motion; Dkt. No. 46, Text Order. Respondent submitted a response. Dkt. No. 47, Memorandum of Law in Opposition to Petition; Dkt. No. 48, Answer; Dkt. No. 49-1–4, State Court Records; Dkt. No. 49-5–15, State Court Transcripts.

Petitioner requested: an extension of time to file a reply, appointment of counsel, an evidentiary hearing, and expanded discovery. Dkt. No. 52, Letter Motion. On February 23, 2021, the undersigned granted Petitioner's request for an extension of time and denied his requests for appointment of counsel, an evidentiary hearing, and expanded discovery. Dkt. No. 53 at 6-7, Decision and Order. Petitioner subsequently appealed the undersigned's denial of his request for appointment of counsel and an evidentiary hearing to the Second Circuit. Dkt. No. 54, Notice of Appeal. The Second Circuit dismissed Petitioner's appeal on September 29, 2021. Dkt. No. 68, Mandate of U.S.C.A.

Petitioner successfully requested a second extension of time to file a reply. Dkt. No. 56, Letter Motion; Dkt. No. 57, Text Order. Petitioner also submitted a motion which was liberally construed as requesting reconsideration of the April 21, 2020, denial of Petitioner's request for additional discovery. Dkt. No. 58, Letter Motion. Respondent opposed the motion. Dkt. No. 61. On May 19, 2021, the undersigned denied Petitioner's motion for reconsideration. Dkt. No. 62 at 5, Decision and Order. Petitioner appealed the Magistrate Judge's decision to the District Court. Dkt. No. 63. Respondent opposed Petitioner's appeal. Dkt. No. 66. On July 8, 2021, the District Court affirmed the undersigned denial of Petitioner's motion for reconsideration. Dkt.

No. 67, Text Order.  Petitioner moved for reconsideration of the aforementioned Text Order.  Dkt. No. 71.  The District Court denied Petitioner's motion.  Dkt. No. 72, Text Order.

Petitioner also advised the Court he was unable to access the law library to reply to the Respondent's opposition to his amended petition.  Dkt. No. 64, Letter Motion.  Accordingly, the undersigned sua sponte extended Petitioner's time to file a reply.  Dkt. No. 65, Text Order.  Petitioner declined to file a reply.  *See* Dkt. No. 72, Text Order.

## II.  RELEVANT BACKGROUND

### A.  Indictment

In an indictment dated July 15, 2014, Petitioner was charged with: six counts of Criminal Possession of a Controlled Substance in the Third Degree, in violation of N.Y. Penal Law ("P.L.") § 220.16; and three counts of Criminal Sale of a Controlled Substance in the Third Degree, in violation of P.L. § 220.39.  Dkt. No. 49-1 at 251-54, Indictment.  A Grand Jury found that Petitioner, "on or about March 28, 2014, . . . possess[ed] Cocaine, a narcotic drug, with the intent to sell it" and "sold Cocaine[;]" "on or about April 28, 2014, . . . possess[ed] Heroin, a narcotic drug, with the intent to sell it" and "sold Heroin[;]" "on or about April 30, 2014, . . . possess[ed] Heroin . . . with the intent to sell it" and "sold Heroin[;]" and "on or about June 11, 2014, . . . "possess[ed] Heroin . . . with the intent to sell it[,]" "possess[ed] Cocaine . . . with the intent to sell it[,]" and "possess[ed] one or more preparations, compounds, mixtures or substances containing cocaine . . . with an aggregate weight of one-half ounce or more."  *Id*.

### B.  Pre-Trial Proceedings

Petitioner was represented by three attorneys during the course of his pre-trial proceedings– the relevant portions of which are discussed in connection with Petitioner's claims in the instant matter –until the conclusion of a *Huntley/Wade/Mapp* hearing on April 24, 2015, [1] when Petitioner informed Clinton County Court ("trial court") that he wished to proceed pro se.  Dkt. No. 49-5 at 216.

### C.  Jury Trial

Petitioner's jury trial before Clinton County Court commenced on June 24, 2015. *See generally*, Dkt. No. 49-5 at 269.  A jury was selected and sworn in, the Assistant District Attorney ("A.D.A.") delivered the People's opening statement, and Petitioner made an opening statement thereafter.  Dkt. No. 49-8 at 143-48; Dkt. No. 49-9 at 1-18.

New York State Police Investigator Timothy Connolly testified he was assigned to the narcotics enforcement unit where he worked with confidential informants ("CI"s) to conduct controlled purchase operations.  Dkt. No. 49-9 at 19-29.  Connolly testified on March 28, 2014, CI "K.D." advised him she could purchase cocaine from an individual known to the CI as "Jay" at 14 Cross Road in Plattsburgh.  *Id*. at 39-41.  The CI was provided a recording and audio transmitting device and fifty dollars to purchase "[h]alf a gram of cocaine[.]"  *Id*. at 45.  K.D. identified Petitioner as the individual known to her as "Jay[.]"  Dkt. No. 49-10 at 122-23.  K.D. testified that on March 28, 2014, she met with

---

[1] *See generally*, *People v. Huntley*, 15 N.Y.2d 72 (1965); *Brown v. City of Utica*, No. 6:17-CV-1190 (BKS/ATB), 2020 WL 1046022, at *1 n.2 (N.D.N.Y. Mar. 4, 2020) (explaining, "a *Huntley* hearing tests the voluntariness of a defendants post-arrest statements[.]") (quotations and citations omitted); *United States v. Wade*, 388 U.S. 218 (1967); *United States v. Gershman*, 31 F.4th 80, 92-93 (2d Cir. 2022) (explaining, "[t]he purpose of a *Wade* hearing is to determine before the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." (quotation and citation omitted)), *cert. denied*, 143 S.Ct. 816 (Feb. 21, 2023); *Mapp v. Ohio*, 367 US 643 (1961); *Anderson v. Miller*, No. 9:19-CV-1123 (BKS), 2022 WL 4465294, at *1 n.5 (N.D.N.Y. Sept. 26, 2022) (explaining, "[a] *Mapp* hearing tests the constitutionality of the seizure of physical evidence.") (additional quotations and citations omitted).

Petitioner at 14 Cross Road and gave him the fifty dollars; Petitioner told her he "only had hundreds so he had to go get a half" a gram of cocaine; then provided her with the requested "half a gram of cocaine" packaged "[i]n a ziplock bag." *Id*. at 128-29.

K.D. testified that she met with Investigators Connolly and Ewing and provided them the cocaine and the electronic devices. Dkt. No. 49-10 at 129-30. Connolly identified People's Exhibit 5 as the "tie-off" of "cocaine that [Petitioner] sold to" K.D. on March 28, 2014. Dkt. No. 49-9 at 55-56. Forensic scientist Kathryn Botting testified she performed tests on the substance contained in People's Exhibit 5 and concluded "the sample contained cocaine." Dkt. No. 49-13 at 103-07.

Connolly testified that a second CI, "S.V.[,]" informed him that she could purchase heroin from "Jay[.]" Dkt. No. 49-9 at 68-69. Connolly stated that S.V. was provided recording and transmitting devices and "eighty dollars" to purchase "[f]our bags of heroin" on April 28, 2014. *Id*. at 70-73. S.V. identified Petitioner as "Jay[.]" Dkt. No. 49-11 at 38-39. S.V. testified that on April 28, 2014, she met with Petitioner in front of 14 Cross Road, then the pair walked to the back of the residence and entered a "camper" where the CI "asked for the four bags" and Jay "gave [her] six bags, and [she] gave him the money and left." *Id*. at 44-47.[2]

After obtaining the bags from Petitioner, S.V. met with the Investigators and provided them the electronic devices and six bags. Dkt. No. 49-11 at 47-48. Connolly identified People's Exhibit 9 as "the heroin that was sold to [S.V.] on April 28, 2014." Dkt. No. 49-9 at 83. Botting testified that she performed tests on People's Exhibit 9 and determined "the sample contained heroin and morphine." Dkt. No. 49-13 at 109-11.

---

[2] S.V. explained "[i]t was common for [Petitioner] to do that, to give people extras." Dkt. No. 49-11 at 47.

Connolly testified that S.V. reported she could purchase an additional "two bags of heroin from" Petitioner on April 30, 2014.  Dkt. No. 49-9 at 88-89.  S.V. testified that she arranged to meet with Petitioner "at Dunkin' Donuts" to conduct the purchase.  Dkt. No. 49-11 at 49-50.  S.V. was again provided electronic devices and "forty dollars" to purchase the heroin.  Dkt. No. 49-9 at 91.  S.V. testified she entered Petitioner's vehicle in the "Dunkin' Donuts" parking lot and "asked for the two bags[,]" then Petitioner "pulled out a prescription bottle, took two bags out [from the] multiple bags of heroin that were in the prescription bottle, [and] gave them to [S.V.]"  Dkt. No. 49-11 at 53.  After receiving the bags from Petitioner, S.V. provided him the money and exited the vehicle to meet with the investigators.  *Id*.

S.V. explained the heroin she purchased from Petitioner was packaged "[i]n wax baggies" on both April 28, and April 30, 2014.  Dkt. No. 49-11 at 54.  Connolly identified People's Exhibit 13 as the "two white wax envelopes containing heroin" that Petitioner sold to S.V. on April 30, 2014.  Dkt. No. 49-10 at 9.  Botting testified she performed tests on People's Exhibit 13 which revealed "the sample contained heroin and morphine."  Dkt. No. 49-13 at 114.

New York State Police Investigator Joey Rice testified that, as a member of the "Adirondack Drug Task Force[,]" he was involved in an investigation, the subject of which was the Petitioner.  Dkt. No. 49-13 at 25-26.  Rice testified that on June 11, 2014, he "received a call from Group Supervisor Matt Bell who advised [Rice] that [Petitioner] was" driving in his vehicle "northbound heading towards the Plattsburgh area[.]"  *Id*. at 27.  Accordingly, Rice "called Trooper Brian Caron . . . [and] asked him to keep watch out for [Petitioner's] vehicle coming northbound on I-87."  *Id.*  Caron testified that Rice

advised him that "there was a silver vehicle [driving] northbound somewhere in the area of Exit 33 with Pennsylvania plates, and . . . suspected for transporting narcotics" and instructed Caron "if [Caron] came upon that vehicle and [he] observed a traffic violation to stop the vehicle."  Dkt. No. 49-12 at 76.

Caron explained that he "drove to Exit 34" and entered "the interstate northbound and continued north" in an attempt to locate the vehicle and testified it was "cloudy" and "raining" and the "roads were wet."  Dkt. No. 49-12 at 78.  Caron stated, under vehicle and traffic law, use of headlights is "required" when vehicles operate with "the windshield wipers [turned] on" and recalled that the windshield wipers of his own vehicle were turned on at a "steady" pace at the time he entered the interstate.  *Id*.  Caron testified he located the vehicle Rice described "about three or four miles north of Exit 34 on the interstate" and observed "the windshield wipers were on" but "[t]here were no taillights on the vehicle" which led Caron to believe "either the vehicle [wa]s equipped with daytime running lights or that no lights were on at all[.]"  *Id*. at 79.  Therefore, Caron "radioed . . . Trooper Ron Arnold" and asked Arnold to determine whether the vehicle Caron was following had the headlights turned on.  *Id*. at 80.

Approximately five minutes later, as both vehicles passed Arnold, "Arnold told [Caron] . . . that there were no headlights on in the vehicle at all."  Dkt. No. 49-12 at 80.  Based on Arnold's observation, "[w]hen it was safe to do so[, Caron] initiated a traffic stop of the vehicle" in the "[t]own of Plattsburgh."  *Id*. at 80-81.  Caron explained "Trooper Brett Smith" arrived on the scene and approached the passenger's side of the vehicle as Caron approached the driver's side.  *Id*. at 81.  Caron testified the operator of

the vehicle produced a Pennsylvania driver's license bearing the name "Raymond Jackson" and identified Petitioner as the driver. *Id*. at 82.

After Caron spoke to Petitioner and Smith spoke to the other occupant, the two discussed their conversations and "determined that two different stories were given from the two different occupants of the vehicle." Dkt. No. 49-12 at 84. Accordingly, Caron performed "DMV checks of the vehicle and the operator" and "call[ed] Investigator Rice and let him know" what had happened. *Id*. Rice instructed Caron "to detain both occupants of the vehicle" and advised Caron that a "K9" would report to the scene. *Id*. at 85.

Border patrol agent Aaron Carlson testified he worked with a K9 named "Avan" in 2014, who was "trained to detect[, *inter alia*,] concealed human beings, . . . cocaine and its derivatives, [and] heroin and its derivatives[.]" Dkt. No. 49-13 at 80-81. Carlson stated on June 11, 2014, he received a phone call informing him a K9 response was requested at "a vehicle stopped on . . . Interstate 87[.]" *Id*. at 83. Caron testified Carlson arrived "[w]ithin five minutes" of Caron's phone call to Rice. Dkt. No. 49-12 at 85. Carlson explained K9 Avan "performed a non-intrusive free air sniff of the vehicle" and "alerted to the vehicle[,]" indicating to Carlson "that there was . . . at least one of the trained odors present." Dkt. No. 49-13 at 84. Following the K9 alert, Rice arrived on the scene and instructed Caron to "bring [Petitioner] back to the state police barracks in Plattsburgh[.]" Dkt. No. 49-12 at 85.

Plattsburg Police Department Detective Christopher Maggy, another member of the Adirondack Drug Task Force, reported to "the DEA office in Plattsburgh" to "await the arrival of" Petitioner's vehicle. Dkt. No. 49-13 at 143-45, 151-52. After Rice

informed Maggy that a "warrant had been endorsed[,] . . . [Maggy], Detective Bell[,] and Agent Carlson" prepared to "perform an actual search of the vehicle[.]"  Dkt. No. 49-13 at 155.  Maggy testified, "a suitcase that was located in the trunk area of the vehicle" was removed and searched.  *Id*. at 158.  Maggy testified the contents of the suitcase were removed and he "observe[d] the actual lining to the suitcase had been unzipped" and "fe[lt] a bump underneath the lining."  Dkt. No. 49-14 at 2.  Maggy unzipped the lining of the suitcase and discovered "a sealed oven bag" which contained "several white wax envelopes or bundles" which Maggy recognized as "commonly used to package heroin."  *Id*. at 4.  Maggy also "located a second sealed oven ziplock bag . . . [and] observed what appeared to [be] . . . clear plastic tie-offs which are commonly used . . . to package cocaine or crack cocaine."  *Id*. at 5-6.  Rice later clarified the large bag contained "several other baggies[,]" including one that "contained a large chunk" and other, even smaller baggies which were "wrapped into . . . smaller increments."  Dkt. No. 49-13 at 36-37.

Maggy explained "Investigator Rice was going to be the primary agent on th[e] case."  Dkt. No. 49-14 at 8.  Rice testified he "received a phone call from . . . Maggy, who said that they had found a quantity of narcotics in the vehicle[;]" therefore, Rice secured the narcotics "and transported them back to SP-Plattsburgh" where field tests were conducted.  Dkt. No. 49-13 at 32.  Rice testified the narcotics discovered in Petitioner's vehicle included "wax envelopes wrapped in rubberbands in quantities of ten"– the contents of which "field tested positive for heroin" –and "[an]other package . . . which . . . field tested . . . positive for cocaine."  *Id*. at 33.  Rice identified People's

Exhibit 14 as "the heroin evidence with the bundles" and People's Exhibit 15 as "the evidence of the cocaine[.]"  *Id*. at 46.

New York State Police forensic scientist Jamie Sickinger testified that she performed "two preliminary tests and a confirmatory test" on the substances contained in People's Exhibits 14 and 15.  Dkt. No. 49-13 at 130-36.  Sickinger explained that testing revealed "heroin was present in [the] sample" taken from People's Exhibit 14.  *Id*. at 134.  Sickinger also concluded, "cocaine [wa]s present in the sample" of People's Exhibit 15.  *Id*. at 136.

After the People rested their case, Petitioner delivered his summation, the A.D.A. delivered the People's summation, and Clinton County Court instructed the jury on the law.  Dkt. No. 49-14 at 84-131; Dkt. No. 49-15 at 1-67.  The jury returned a verdict of guilty for all nine counts.  Dkt. No. 49-15 at 83-85.

### D. Sentencing

On September 9, 2015, Petitioner appeared before Clinton County Court for sentencing.  Dkt. No. 49-15 at 90-104.  The A.D.A. asked County Court to sentence Petitioner to a total sentence of twenty-four years' determinate, to be followed by eight years of post-release supervision.  *Id*. at 91-94.  Petitioner made a statement thereafter. *Id*. at 95-96.

County Court sentenced Petitioner to determinate terms of three years, to be followed by two years' post-release supervision, for his convictions on counts one and two, to run concurrently with each other.  Dkt. No. 49-15 at 99.  For his convictions on counts three and four, County Court sentenced Petitioner to three-year determinate sentences, to run concurrently with each other and consecutively to the sentences

imposed for counts one and two, and two years of post-release supervision.  *Id.*  For his

convictions on counts five and six, Petitioner was sentenced to three-year determinate

terms, to run concurrently with each other and consecutively to the sentences imposed

for counts three and four, to be followed by two years of post-release supervision.  *Id*. at

99-100.  Finally, Petitioner was sentenced to four year determinate sentences for his

convictions on counts seven, eight, and nine, to run concurrently with each other and

consecutively to the sentences imposed for counts five and six, and two years' post-

release supervision.  *Id*. at 100.

### E.  Direct Appeal

Petitioner appealed his judgment of conviction.  *See* Dkt. No. 49-1 at 1-248,

Petitioner's Counseled Appellate Division Brief and Appendix, 249-93, Record on

Appeal, Dkt. No. 49-2 at 1-141, Record on Appeal, Dkt. No. 49-3 at 1-23, Record on

Appeal, 24-87, Petitioner's Pro Se Supplemental Brief and Exhibits, 88-436, The

People's Appellate Division Brief and Appendix.  In his counseled brief, Petitioner

argued: (1) County Court did not conduct a sufficient inquiry into Petitioner's waiver of

the right to counsel (Dkt. No. 49-1 at 21-25); (2) County Court's admission of evidence

related to an uncharged drug crime deprived Petitioner of a fair trial (Dkt. No. 49-1 at

25-29); (3) testimony concerning uncharged drug sales rendered several counts

duplicitous (Dkt. No. 49-1 at 29-31); and (4) the prosecutor committed misconduct by

vouching for a witness' credibility and shifting the burden of proof during the People's

summation (Dkt. No. 49-1 at 31-36).  In a supplemental pro se brief, Petitioner added:

(1) police committed misconduct by tampering with evidence (Dkt. No. 49-3 at 36-39);

(2) physical evidence collected from Petitioner's car should not have been admitted

13

(Dkt. No. 49-3 at 39-40); (3) the trial court erred in failing to grant Petitioner's motion to suppress physical evidence collected pursuant to an invalid search warrant (Dkt. No. 49-3 at 40-43); and (4) the identification process was tainted when police forged a signature on a photograph identification form (Dkt. No. 49-3 at 43-44).

On April 12, 2018, the Appellate Division, Third Department, affirmed Petitioner's judgment of conviction. *People v. Jackson*, 160 A.D.3d 1125 (N.Y. App. Div. 3rd Dep't 2018).[3]  The Third Department held "County Court conducted a sufficient 'searching inquiry' in response to [Petitioner]'s request to proceed pro se," noting that the trial court "discussed the risks and disadvantages of self-representation with" Petitioner and "conducted a separate inquiry to address the knowing and intelligent character of [Petitioner]'s request to represent himself." *Id*. at 1126-27 (citations omitted).  Next, the Appellate Division found Petitioner's duplicity claim to be "unpreserved" but further explained that "[n]o modification would be warranted if this issue had been preserved" because "the challenged counts clearly reference the dates on which the charged crimes took place" and "Cis' testimony that they knew defendant from earlier drug transactions was distinct from their testimony about the charged crimes[.]" *Id*. at 1127-28.

Similarly, the Third Department held that Petitioner "failed to preserve claims related to evidentiary errors and acts of prosecutorial misconduct," but, "[h]ad these alleged errors been preserved, no modification would have been required." *Jackson*, 160 A.D.3d at 1128 (citations omitted).  The Appellate Division explained that the testimony concerning prior uncharged drug transactions "provided necessary

---

[3] A copy of the Third Department's Memorandum and Order affirming Petitioner's judgment of conviction is included in the State Court Records.  *See* Dkt. No. 49-3 at 437-43.

background information regarding how [Petitioner] became an investigation target, was

relevant to [Petitioner]'s identification and, with one exception, was not unduly

prejudicial[.]" *Id*. (citations omitted).  Furthermore, while "the probative value of one CI's

testimony that she had engaged in sexual intercourse with [Petitioner] in exchange for

drugs . . . was outweighed by its potential prejudicial impact . . . the properly-admitted

proof against [Petitioner] was overwhelming[;]" thus rendering any errors harmless.  *Id*.

(citations omitted).  Concerning Petitioner's prosecutorial misconduct claim, the

Appellate Division observed that Petitioner failed to object to the remarks at issue during

the People's summation; however, even "[i]f these claims had been preserved, [the

Third Department] would have found that most of the challenged remarks, when taken

in context, were fair responses to [Petitioner]'s summation or fair comments on the

evidence[.]"  *Id*. at 1129 (citations omitted).

The Third Department also held that the claims in Petitioner's pro se

supplemental brief were "unavailing."  *Jackson*, 160 A.D.3d at 1129.  The Appellate

Division observed Petitioner's "challenge to the search warrant on the ground that the

*Aguilar-Spinelli* test was not satisfied [wa]s without merit, as the CIs were deposed in

camera before the issuing magistrate, rendering that standard inapplicable[.]"  *Id*.

(citations omitted).  Additionally, Petitioner "did not object to the admissibility of certain

drug evidence at trial . . . and his underlying arguments about gaps in the chain of

custody—which he did raise during the trial— go to the weight of the evidence, not its

admissibility[.]"  *Id*. (internal quotations and citations omitted).  Finally, the Third

Department explained that Petitioner's "arguments about alleged forgeries and evidence

tampering by the police presented issues of credibility for the jury that were clearly resolved against him[.]" *Id.* (citations omitted).

Petitioner sought leave to appeal the Third Department's decision affirming his judgment of conviction. *See* Dkt. No. 49-3 at 444-60, Petitioner's Pro Se Leave Application, 461-69, Counseled Application for Leave.  The People opposed Petitioner's Application for Leave.  *See* Dkt. No. 49-3 at 470-541, Dkt. No. 49-4 at 1-12, The People's Opposition to Petitioner's Leave Application.[4]  On July 18, 2018, the Court of Appeals denied Petitioner's application for leave to appeal. *People v. Jackson*, 31 N.Y.3d 1149 (2018).[5]

### F.  Writ of Error Coram Nobis

On May 1, 2019, Petitioner filed a Motion for a Writ of Error Coram Nobis.  Dkt. No. 49-4 at 34-128, Petitioner's Motion for a Writ of Error Coram Nobis and Exhibits. Petitioner argued that he was deprived of the effective assistance of counsel because his appellate counsel failed to: (1) argue that County Court should have inquired into Petitioner's mental health history in connection with Petitioner's waiver of the right to trial counsel, and (2) challenge the sufficiency of probable cause to search Petitioner's vehicle.  *See id.* at 44-62.  The People opposed Petitioner's motion.  *Id.* at 129-42, The People's Opposition to Petitioner's Motion.

The Appellate Division, Third Department, denied Petitioner's motion.  Dkt. No. 49-4 at 143, Appellate Division Decision and Order.  Petitioner applied for leave to appeal the Third Department's denial of his motion.  *Id.* at 144-57, Petitioner's Leave

---

[4] Petitioner also filed a response to the People's opposition to his leave application.  *See* Dkt. No. 49-4 at 22-32.
[5] A copy of the Court of Appeals' Opinion denying Petitioner's leave application is included in the State Court Records.  *See* Dkt. No. 49-4 at 33.

Application.  On November 13, 2019, the Court of Appeals denied Petitioner's

application for leave.  *Id*. at 158, Court of Appeals Order.

### G. Motion to Vacate

On February 21, 2020, Petitioner filed a Motion to Vacate his conviction pursuant

to N.Y. Criminal Procedure Law ("C.P.L.") § 440.10 in Clinton County Court.[6]  Dkt. No.

49-4 at 159-219, Petitioner's Motion to Vacate and Exhibits.  Petitioner asserted he was

entitled to a new trial on the basis of newly-discovered evidence, specifically a contact

sheet and a Disc containing photographs, and that the People's withholding of these

exculpatory materials violated Petitioner's rights under *Brady v. Maryland*.  *See id*. at

165-72.  The People opposed Petitioner's motion.  *Id*. at 220-349, The People's

Opposition to Petitioner's Motion and Exhibits.

Clinton County Court denied Petitioner's Motion to Vacate, reasoning that

Petitioner's claim that law enforcement tampered with physical evidence had been

adjudicated by the Appellate Division on direct appeal.  Dkt. No. 49-4 at 350-35, County

Court's Decision and Order.[7]  Petitioner applied for leave to appeal County Court's

denial of his motion.  *Id*. at 354-59.[8]  On October 8, 2020, the Appellate Division, Third

Department, denied Petitioner's leave application.  *Id*. at 367, Third Department

Decision and Order.

### III.  PETITION

Petitioner challenges his 2015 judgment of conviction in Clinton County Court on

six counts of Criminal Possession of a Controlled Substance in the Third Degree and

---

[6] *See generally*, C.P.L. § 440.10(1)(g)-(h).
[7] *See also* C.P.L. § 440.10(2)(a).
[8] The People opposed Petitioner's leave application.  *See* Dkt. No. 49-4 at 360-62.  Petitioner
subsequently submitted a reply to the People's opposition.  *See id*. at 363-66.

three counts of Criminal Sale of a Controlled Substance in the Third Degree.  Am. Pet. at 1.  Petitioner contends that he is entitled to federal habeas relief because: (1) his conviction was based on fraudulent evidence (*Id*. at 5-6); (2) law enforcement lacked probable cause to search his vehicle (*Id*. at 6-8);(3) the People failed to establish a proper chain of custody for physical evidence recovered from the aforementioned vehicle (*Id*. at 8-9); and (4) the trial court failed to conduct a thorough inquiry into Petitioner's mental health when evaluating his request to proceed pro se (*Id*. at 9-11). Respondent argues: (1) the state courts' denial of Petitioner's fraudulent evidence claim was neither contrary to, nor did it involve an unreasonable application of, clearly-established federal law (Dkt. No. 47 at 28-31); (2) Petitioner's illegal search claim is barred from habeas review by *Stone v. Powell* (Dkt. No. 47 at 31-34); (3) Petitioner's evidentiary claim is unexhausted, procedurally barred, not cognizable on federal habeas review, and meritless (Dkt. No. 47 at 34-39); and (4) Petitioner's competency claim is unexhausted, procedurally barred, and meritless (Dkt. No. 47 at 39-48).

## IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v.*

*Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

### A.  "Fraud Drug Evidence"

Petitioner first asserts he is entitled to habeas relief because "[t]he photograph of 'People's 4' Buy #1 is fraud[ulent] evidence because the drug is the depiction of crack cocaine, and not the actual cocaine powder that was sold on March 28, 2014, (Buy #1)[.]"  Am. Pet. at 5.  Respondent contends the state courts' denial of this claim was neither contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent.  Dkt. No. 47 at 28-31.

At trial, Timothy Connolly testified a CI informed him that she could purchase cocaine from either Petitioner or another individual on March 28, 2014.  Dkt. No. 49-9 at 41.  The CI was provided "fifty dollars" to purchase a "[h]alf a gram of cocaine[.]"  *Id*. at 45.  Connolly testified the investigators utilized an audio transmitting device to listen as the CI traveled to the location of the controlled buy and completed the transaction.  *Id*. at 46-48.  Following the transaction, the CI returned to the Plattsburg State Field House and provided Connolly "the half gram baggie . . . a small plastic sandwich baggie tie-off containing the white powdery substance, which was cocaine."  *Id*. at 48.

At trial, Connolly identified "People's Exhibit 4" as the photograph he took of the "tie-off" the CI purchased from Petitioner on March 28, 2014.  Dkt. No. 49-9 at 57-59. Connolly explained he photographed and weighed the "tie-off" after he received it from the CI, then conducted a "field test" of the substance, which he identified as cocaine, then sent it to the New York State Police Lab for additional examination and testing.  *Id*. at 56.  Connolly identified "People's Exhibit 5" as "the open plastic tie-off that contained the cocaine that [Petitioner] sold to [the CI]" on March 28, 2014.  *Id*. at 55-56.  "People's Exhibit 4" was admitted into evidence without objection.  *Id*. at 59.

Connolly stated the "People's Exhibit 4" depicted the "tie-off" of cocaine on a scale, which read the item's weight as "half a gram[.]"  Dkt. No. 49-9 at 61.  Connolly explained the reading of "half a gram" included the weight of both the substance and the packaging; therefore, the substance alone would not weigh half a gram.  *Id*. at 61-62. Connolly testified that, in his experience, "a Plattsburg gram" of cocaine or crack cocaine would contain ".7 to .8" grams of the substance, but if a buyer wished to purchase "half a gram[,]" the product would contain ".3 to .4 grams" of the substance. *Id*. at 62.

Connolly further explained substances were typically packaged in one gram increments; therefore, if a buyer wished to purchase a smaller amount, "[t]hey would have to take it out of the baggie and break it into half and re-package it into another plastic tie-off."  Dkt. No. 49-9 at 62.  When this occurred, Connolly explained the substance "would be kind of a crumbly substance [because t]here would be powder mixed in with it[.]"  *Id*. at 63.  The witness stated the texture of the substance contained

in "People's Exhibit 5" appeared "consistent" with a half a gram of cocaine which had been broken off from a full gram. *Id*.

On cross-examination, Connolly confirmed Petitioner "sold a cocaine powder substance to K.D." on March 28, 2014. Dkt. No. 49-10 at 17. Connolly described cocaine as "a white powdery substance" and stated, in his experience, "[e]very cocaine that [he had] seen[,] it is powdery, but there are clumps in it." *Id*. at 17-18. Connolly confirmed People's Exhibit 5 was "the actual cocaine" Petitioner sold to the CI on March 28, 2014.[9] *Id*. at 19. Connolly further described the item, stating "[i]t's powdery and there are some clumps, which is consistent with the cocaine we buy in Clinton County." *Id*. Petitioner displayed "People's Exhibit 4" and asked Connolly whether the item the witness was "holding in [his] hand," People's Exhibit 5, "that powdery substance . . . with the little chunks . . . [wa]s the same drug that was sold on March 28, this one right here," apparently referring to People's Exhibit 4. *Id*. at 19-20. Connolly answered "[y]es, it is." *Id*. at 20. Petitioner asked the following questions and the witness provided the following answers:

> [Petitioner]: Is that a powdery substance, sir?
> [Connolly]: Yes, it is.
> [Petitioner]: It is?
> [Connolly]: Yes. It's a corner of the plastic baggie that's tied off and it's packaged so tight in there, the powder, it gives that look. It's consistent with every cocaine in this area.
> [Petitioner]: That's strange. You know why? Because this right here looks like a block.
> [Connolly]: From the corner of the baggie.

*Id*. at 21.

---

[9] "People's Exhibit 5" had not been admitted into evidence at the time Petitioner conducting his cross-examination of Connolly. Dkt. No. 49-10 at 20.

Kathryn Botting identified "People's Exhibit 26" as a "copy of the case receipt record" for New York State Police Forensic Investigation Center "Laboratory Case No. 15HL-01151" and "People's Exhibit 5" as "the evidence associated with" the aforementioned case number.  Dkt. No. 49-13 at 100-03.  Botting testified she performed "a color test, a chromatographic screening test[,] and a molecular confirmation test" on the evidence and concluded "the sample contained cocaine."  *Id*. at 105-07.  Botting explained the results of the tests she performed would not have differed, irrespective of the "crack" or "powdered" form of the substance.  *Id*. at 106-07.

On cross-examination, relying on the report generated for Case No. 15HL-01151, Botting testified she reported the weight of the item as "0.39 grams," explaining "that aggregate weight means the total weight of the powder substance that was submitted." Dkt. No. 49-13 at 116-17.  Petitioner asked whether the aggregate weight measurement "[i]nclud[ed] the bag, the tie-off" and Botting clarified the weight measured "[j]ust the powder substance, no packaging . . . the weight on the report is only the substance itself."  *Id*. at 117.  Botting testified measuring weight in said manner was procedure.  *Id*. Petitioner asked about "the difference between cocaine powder and crack cocaine" and Botting explained "[i]t is a form . . . crack cocaine being the base form and what is referred to as powder cocaine being the salt or hydrochloride form of cocaine."  *Id*. at 120.  Petitioner also referred to "People's Exhibit 4" and asked the witness to "read the scale number on that weight[.]"  *Id*. at 123.  Botting testified the number read "0.5 without a unit of measurement" but agreed it was "[p]ossibl[e]" that the measurement was "half a gram[.]"  *Id*.

On direct appeal, Petitioner argued "the photograph that was introduce[d] as evidence, by the prosecution, [as] People's [Exhibit] 4 . . . is not the same drug evidence, or the identical object[,] that is associated with People's [Exhibit] 5" because the substances in the two exhibits differed "in shape, and size, and . . . physical condition." Dkt. No. 49-3 at 36. Petitioner averred the "People['s Exhibit] 4[] is legally insufficient evidence, because People's 4" did not "depict[]" and was not "identical to People's [Exhibit] 5, the cocaine powder[,]" rather, People's Exhibit 4 depicted "a 'hard solid rock' 'chunky' hard substance[,] a triangle block shape." *Id*. at 37. The Appellate Division held "[Petitioner]'s arguments about alleged forgeries and evidence tampering by the police presented issues of credibility for the jury that were clearly resolved against him[.]" *Jackson*, 160 A.D.3d at 1129 (citations omitted). Petitioner has failed to demonstrate this conclusion was either contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

As an initial matter, Petitioner has not alleged Clinton County Court's admission of the photograph was improper, nor does he claim the evidence supporting his conviction on counts one and two was not legally sufficient. *See* Am. Pet. at 5. Instead, Petitioner contends federal habeas relief is warranted because the photograph admitted as "People's Exhibit 4" did not depict the item a prosecution witness purported it did.

It is well established that reviewing courts "must defer to the jury's assessments of both the weight of the evidence and the credibility of the witnesses[.]" *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990), *cert. denied*, 498 U.S. 872 (1990) (citations omitted); *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (same); *see also*, *e.g.*, *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (explaining "28 U.S.C. § 2254(d) gives

23

federal habeas courts no license to redetermine credibility of witnesses[.]").  Therefore, it was the jury's responsibility to determine whether "People's Exhibit 4" did, in fact, depict the tie-off of cocaine the CI purchased from Petitioner on March 28, 2014, as Connolly claimed.  *See, e.g.*, *Gonzalez-Pena v. Herbert*, 369 F. Supp. 2d 376, 387 (W.D.N.Y. 2005) ("[t]he issue of whether the packets introduced at trial and analyzed as heroin were the packets seized . . . was for the jury to decide based upon all the evidence before it.") (citing *Howard v. Keane*, No. 1:91-CV-0723, 1991 WL 352488, at *2 (E.D.N.Y. Dec. 9, 1991) ("[w]hether the packets introduced at trial and analyzed as cocaine were the packets seized was for the jury to decide.")).

Following Connolly's identification of the exhibit on direct examination, Petitioner conducted a thorough cross-examination, during which he inquired about the appearance of the cocaine he was charged with selling to the CI.  *See* Dkt. No. 49-10 at 17-21.  The witness asserted that, based on his experience, the substance depicted in the photograph was "consistent with" cocaine and that the appearance of what Petitioner called "a block" could be attributed to the substance's location in "the corner of the baggie."  *Id*. at 21.  Similarly, during his cross-examination of the People's expert, Petitioner asked a series of questions concerning the apparent disparity between the tie-off's reported weight of "0.39 grams" and the "0.5" weight reading on the scale as depicted in the photograph.  *See* Dkt. No. 49-13 at 116-23.  Botting explained "the weight on the report is only the substance itself" and did not include the plastic bag packaging.  *Id*. at 117.

The jury's decision to credit the prosecution's theory of the case– that "People's Exhibit 4" was a photograph of cocaine K.D. purchased from Petitioner –rather than the

defense's presents no issue of constitutional dimension. *Campbell v. Greene*, 440 F. Supp. 2d 125, 157-58 (N.D.N.Y. 2006) (rejecting the petitioner's "claim[] that the testimony provided by the police officers who testified on behalf of the prosecution was 'not credible[]'" because "it is well established that courts viewing a cold record may not properly reassess the jury's finding of credibility concerning the testimony of witnesses offered at trial."); *see also Stallings v. Woods*, No. 1:04-CV-4714, 2006 WL 842380, at *9 (E.D.N.Y. Mar. 27, 2006) ("juror[s] w[ere] certainly entitled to credit the prosecution's version of events over that of the defense. This Court may not revisit these credibility determinations.") (citations omitted); *Alvarez v. Conway*, No. 1:05-CV-3235, 2005 WL 3434634, at *5 (S.D.N.Y. Dec. 13, 2005) ("[t]he jury obviously accepted the prosecutor's argument in rendering its verdict, and it is axiomatic that a habeas court may not revisit the jury's credibility determinations.") (citing *Marshall*, 459 U.S. at 432-35; *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993)).

In sum, the Appellate Division's conclusion – that Petitioner's claim that "People's Exhibit 4" was not actually a photograph of the tie-off of cocaine the CI purchased from Petitioner on March 28, 2014, was a matter for the jury to resolve – was neither contrary to, nor did it involve an unreasonable application of, clearly-established federal law. Accordingly, federal habeas relief is not warranted.

### B.    "Insufficient Probable Cause, Illegal Search [and] Seizure"

Petitioner next avers he is entitled to federal habeas relief because of an "illegal search [and] seizure[.]"  Am. Pet. at 6.  Petitioner claims "[a]n unidentifi[ed] law enforcement source contact[ed] Det. Matt Bell about a drug transport, but it is unclear where [sic] the law enforcement source got this information of requisite knowledge" and

the magistrate judge "signed a search warrant at 4:35 p.m." to allow police to search Petitioner's vehicle, but evidence demonstrates police "entered the vehicle . . . at 3:18 p.m. and documented the drug evidence [collected as a result of the search of the vehicle] at 3:18 p.m." *Id*. Respondent contends habeas review of Petitioner's Fourth Amendment claim is precluded by *Stone v. Powell*. Dkt. No. 47 at 31-34.

In *Stone v. Powell*, the Supreme Court held, "where [a] State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). Following *Stone*, federal habeas review of Fourth Amendment claims is permissible only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citations omitted).

Petitioner has not, and cannot, claim an absence of corrective procedures to redress the alleged violation here. *See generally*, Am. Pet. at 6. "[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [C.P.L.] § 710.10 *et seq*. . . . as being facially adequate.'" *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989); then citing *Gates v. Henderson*, 568 F.2d 830, 837 n.4 (2d Cir. 1977), *cert. denied*, 434 U.S. 1038 (1978); *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).

Indeed, Petitioner availed himself of the aforementioned procedure by moving, pursuant to C.P.L. § 710.20, to suppress "all evidence seized or discovered as a result of [Petitioner's] traffic stop and subsequent arrest on June 11, 2014[.]"  Dkt. No. 49-2 at 29-33.  Clinton County Court conducted a *Mapp* hearing, during which Petitioner's attorney cross-examined the People's witnesses and asked the court to suppress the fruit of the June 11, 2014, seizure in closing remarks.  Dkt. No. 49-5 at 65-222.  Following the hearing, Clinton County Court issued a written order denying Petitioner's motion to suppress.  Dkt. No. 49-2 at 106-07.  Furthermore, on direct appeal, Petitioner averred his "motion to suppress the physical evidence [collected] on June 11, 2014, . . . should have been granted[,]" an argument which the Appellate Division found to be "unavailing."  Dkt. No. 49-3 at 43; *Jackson*, 160 A.D.3d at 1129.  Therefore, Petitioner is unable to demonstrate a lack of corrective procedures to redress the claimed Fourth Amendment violation.

Nor has Petitioner proved that "an unconscionable breakdown" in New York's corrective processes occurred.  "An unconscionable breakdown in the underlying process occurs when 'the totality of state procedures allegedly did not provide rational conditions for inquiry into federal law.'"  *Cepeda v. Morton*, No. 1:19-CV-2444, 2020 WL 6382052, at *5 (S.D.N.Y. Oct. 30, 2020) (quoting *Capellan*, 975 F.3d at 70), *appeal dismissed*, No. 20-3873, 2021 WL 1964767 (2d Cir. May 13, 2021).  To the extent Petitioner contends the state courts' decisions were incorrect, "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."  *Capellan*, 975 F.3d at 72.[10]

---

[10] Rather, examples of "unconscionable breakdowns in the underlying procedure" justifying habeas inquiry include "situations such as the bribing of a trial judge, the government's knowing use of perjured

In sum, Petitioner was afforded an opportunity to challenge the alleged Fourth Amendment violations in state court and there is no basis to conclude "an unconscionable breakdown" in New York's corrective process occurred here. Therefore, federal habeas review of Petitioner's Fourth Amendment claim is barred.

### C. "Chain of Custody"

Petitioner also argues that habeas relief is warranted because of a "chain of custody" issue related to the "June 11, 2014, drug evidence." Am. Pet. at 8. Petitioner states:

> The drug evidence on June 11, 2014, is being documented at two separate location[s, which] w[ould] be physically impossible. Christopher Maggy['s] field notes show the drugs being discovered at 16:53 and 16:54 and their search concluded at 17:48[.] However, T[roo]p[e]r Bryan C[a]ron is taking photographs of the drug evidence at 5:25 p.m. and concluded at 5:45 p.m. at S[tate] P[olice station at] Plattsburg[;] however, Det. Maggy is in possession of the evidence at the DEA Garage at 5:48 p.m.

Id. Respondent contends this evidentiary claim is not cognizable on federal habeas review and any federal constitutional issue must be denied as procedurally barred due to Petitioner's failure to exhaust state court remedies. Dkt. No. 47 at 34-39.

In his pro se supplemental brief to the Appellate Division, Petitioner argued the "June 11, 2014, drug evidence[] ha[d] a gap in the chain of custody." Dkt. No. 49-3 at 39. Petitioner cited two New York cases with respect to his chain of custody argument. See id. at 39-40. The Third Department found Petitioner's claim to be "unavailing[,]" observing Petitioner did not object to the admissibility of the evidence at trial and,

---

testimony, or the use of torture to extract a guilty plea . . . without opportunity to obtain state review." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (citations omitted), *affirmed*, 852 F.2d 59 (2d Cir. 1988).

irrespective of Petitioner's failure to object, "arguments about gaps in the chain of custody . . . go to the weight of the evidence, not its admissibility[.]" *Jackson*, 160 A.D.3d at 1129 (internal quotations and citations omitted).

"Federal courts in New York have held that a chain of custody argument is a matter governed by New York law and provides no basis for federal habeas relief." *Danford v. Graham*, No. 9:12-CV-0201 (JKS), 2014 WL 1412492, at *5 (N.D.N.Y. Apr. 11, 2014) (citing *Gonzalez-Pena*, 369 F.Supp. 2d at 387; *Tirado v. Senkowski*, 367 F.Supp. 2d 477, 487 (W.D.N.Y. 2005); *Estelle*, 502 U.S. at 67-68).  Therefore, Petitioner's chain of custody claim is not cognizable on habeas review.  *Gonzalez-Pena*, 369 F.Supp.2d at 387-88.  Because Petitioner's chain of custody claim provides no basis upon which federal habeas relief could be granted, dismissal is warranted.

### D.  The Trial Court's Failure to "Conduct a Thorough Inquiry"

Finally, Petitioner avers "County Court . . . did not conduct a thorough inquiry [into] the [P]etitioner's mental health history [prior to] allowing the petitioner to proceed pro se[.]"  Am. Pet. at 9.  Respondent contends Petitioner's competence claim is unexhausted, procedurally defaulted, and meritless.  Dkt. No. 47 at 39-48.

### 1.  Petitioner's Competence Claim is Procedurally Defaulted

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(A)-(B)(ii).  To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively.  Procedural exhaustion requires that a petitioner raise all claims in state

court prior to raising them in a federal habeas corpus petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). In other words, a habeas Petitioner is required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Petitioner did not challenge the trial court's alleged failure to sufficiently inquire into his mental health history on direct appeal in either his counseled or pro se brief. *See* Dkt. No. 49-1 at 1-36, Petitioner's Counseled Appellate Division Brief; Dkt. No. 49-3 at 24-45, Petitioner's Pro Se Supplemental Appellate Division Brief. While Petitioner did assert Clinton "County Court's Searching Inquiry Regarding [Petitioner]'s request to proceed pro se was insufficient because it did not rigorously convey the dangers of waiving counsel at trial"– Dkt. No. 49-1 at 21 –Petitioner's claim that the trial court failed to adequately inform him of the consequences of his decision to waive his right to trial counsel is distinct from Petitioner's claim in the instant petition. Because Petitioner did not "fairly present" the issue raised here in his direct appeal, the instant claim was not properly exhausted. *See Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 192 (2d Cir. 1982) (explaining a federal habeas petitioner has "fairly presented" a claim in state court only where he: (1) "informed the state court of both the factual and the legal premises of the claim he asserts in federal court[,]" and (2) "placed before the state court essentially the same legal doctrine he asserts in his federal petition" because "[t]he chief purposes

of the exhaustion doctrine would be frustrated if [a] federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court.").

Petitioner first raised the issue of his competence to waive his right to trial counsel in his application for coram nobis relief.  Petitioner argued "[a]ppellate counsel was ineffective for not raising [Petitioner]'s lengthy mental health history[,]" specifically, the fact that Petitioner "was hospitalized in a United States federal Medical Center . . . for a mental defect . . . [and Petitioner]'s federal indictment was dismiss[ed] because [Petitioner] was deem[ed] incompetent to stand trial, in the [E]astern [D]istrict [of Pennsylvania.]"  Dkt. No. 49-4 at 38.  "However, a petition for a writ of error *coram nobis* does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel."  *Zimmerman v. Burge*, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) (citing *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001)).  Therefore, Petitioner's claim concerning the trial court's alleged failure to adequately assess Petitioner's competence was not exhausted by Petitioner's application for coram nobis relief on the basis of ineffective assistance of appellate counsel.  *See Miller v. Chapplus*, No. 9:16-CV-0512 (TJM/CFH), 2018 WL 2709228, at *8 (N.D.N.Y. Apr. 2, 2018) ("Petitioner's filing of the coram nobis petition[,]" wherein the Petitioner argued his appellate counsel was ineffective for failing to raise a claim on direct appeal, "did not exhaust his challenge to the underlying state trial court error.") (citation omitted), *report and recommendation adopted*, 2018 WL 2694425 (N.D.N.Y. June 5, 2018).

"For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim

procedurally barred.'" *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989)) (additional citations omitted).

> When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile.

*Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). A Petitioner's unexhausted constitutional claim is procedurally barred under New York law where it was not included in the Petitioner's "completed . . . direct appeal and the nature of the claim is apparent from the face of the record, meaning that [the Petitioner] would be barred from raising it in a motion to vacate the judgment." *Jackson v. Conway*, 763 F.3d 115, 143 (2d Cir. 2014) (citing N.Y. Crim. Proc. Law § 440.10(2)(c); *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003)).

Petitioner's claim concerning the trial court's allegedly insufficient inquiry into his competence is record based. *See United States v. Berger*, 188 F. Supp. 2d 307, 325 (S.D.N.Y. 2002) ("[i]n judging whether a court's decision not to order a competence hearing was in error 'only the evidence before the court at the time its decision was made is pertinent.'") (quoting *Nicks v. United States*, 955 F.2d 161, 168 (2d Cir. 1992)); *United States v. Gabb*, 80 F. App'x 142, 145 (2d Cir. 2003) (explaining "the question of competency and reasonable cause to doubt it must focus upon the defendant's abilities *at the time of trial*, not any conduct discovered or analyzed after the fact.") (citing *United States v. Vamos*, 797 F.2d 1146, 1150-51 (2d Cir. 1986)) (emphasis in original). As such, Petitioner was required to raise the claim on direct appeal; however, because he failed to do so, the claim is procedurally barred by state law. *See* C.P.L. § 440.10(2)(c)

(New York courts "must deny a motion to vacate a judgment" where "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion" but "no such appellate review or determination occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him[.]").

"[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal habeas[.]"  *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991) (citations omitted).[11]  The Supreme Court has held where, as here, "a state prisoner has defaulted his federal" constitutional claim:

> Federal habeas review of the claim[] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.  To satisfy the "cause" requirement, Petitioner must show "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court."  *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995).

### 2. Petitioner has Failed to Demonstrate Either "Cause" for The Procedural Default and Resulting "Prejudice" or "A Fundamental Miscarriage of Justice"

As explained above, Petitioner has argued his appellate counsel was ineffective for failing to challenge the sufficiency of the trial court's consideration of Petitioner's

---

[11] The procedural default doctrine applies whether the default occurred at trial, on appeal or on state collateral review.  *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986).

mental health history in connection with Petitioner's waiver of the right to counsel.  *See* Dkt. No. 49-4 at 38.  However, "attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel."  *Davila v. Davis*, 582 U.S. 521, 528 (2017) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).  Petitioner is unable to prove appellate counsel's failure to raise the instant claim on direct appeal rose to the level of constitutionally defective assistance.

To prove he was denied the effective assistance of counsel, Petitioner must demonstrate: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Under the first prong, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). "To establish *Strickland* prejudice[,] a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).  Accordingly, counsel's failure to raise a meritless claim cannot amount to ineffective assistance.  *See, e.g.*, *Aparicio*, 269 F.3d at 99.[12]

---

[12] *See also Hanks v. Kelly*, No. 9:14-CV-0618 (BKS), 2015 WL 6738830, at *12 (N.D.N.Y. Nov. 4, 2015)

> When challenging the effectiveness of appellate counsel, a petitioner must show that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker" . . . A petitioner must show more than counsel's failure to raise a non-frivolous argument, because counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments, and is not required to advance every argument urged by the petitioner.

(quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); then citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)) (additional citation omitted).

"[T]he Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.'"  *Faretta v. California*, 422 U.S. 806, 835 (1975) (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)). However, "a defendant choosing self-representation must do so 'competently and intelligently[.]'"  *Godinez v. Moran*, 509 U.S. 389, 400 (1993) (quoting *Faretta*, 422 U.S. at 835).  The "standard for competence to . . . waive the right to the assistance of counsel" is the same as the standard for competence to stand trial, a defendant must have the "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and . . . 'a rational as well as factual understanding of the proceedings against him.'"  *Godinez*, 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also King v. Cunningham*, 442 F. Supp. 2d 171, 186 (S.D.N.Y. 2006) (explaining that "[w]hile New York law on competency determinations is different from federal law, it provides the 'procedural protections' required under federal law.") (quoting *Silverstein v. Henderson*, 706 F.2d 361, 367 (2d Cir. 1983)) (footnote omitted).[13]

It is well established that "a competency determination is necessary *only when a court has reason to doubt the defendant's competence*."  *Godinez*, 509 U.S. at 401 n.13 (emphasis added).  "There are . . . no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed[.]"  *Drope v. Missouri*, 420 U.S. 162, 180 (1975).  However, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all

---

[13] *See also Godinez*, 509 U.S. at 399 (rejecting the argument "that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not . . . [because] the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself.").

relevant in determining whether further inquiry is required[.]" *Drope*, 420 U.S. at 180 (citing *Pate v. Robinson*, 383 U.S. 375 (1966)).  Further, "the trial court is required to consider only that evidence actually before it when deciding whether a competency hearing is required."  *Nicks*, 955 F.2d at 169 (citing *Vamos*, 797 F.2d at 1150) (additional citations omitted).

Ultimately, "[t]he inquiry is whether, 'in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial.'" *Nicks*, 955 F.2d 169 (quoting *Drope*, 420 U.S. at 174-75).  In his application for coram nobis relief, Petitioner argued his "extensive history [of] . . . mental health illnesses[;] . . . [use of] psyc[h]otic medication during his detention[; and] . . . outburst[s] with [the] trial judge" demonstrated he "lack[ed] the mental capacity to represent himself in a[] criminal case[.]"  Dkt. No. 49-4 at 46-48.

### i.  Petitioner's History of Mental Health Issues

In arguing appellate counsel was ineffective for failing to raise the issue of his competence to waive the right to counsel, Petitioner stated he "ha[d] been dealing with mental health issues since [he was] a child . . . and during trial proceedings[, Petitioner] did not, and could not, have exercised the right[] to represent himself" especially in light of the fact that he "ha[d] been dem[ed] legally incompetent and lack[ing] the mental capacity to stand trial and to aid in his defense[.]"  Dkt. No. 49-4 at 47 (citing *United States v. Jackson*, No. 03-173-04, 2009 WL 691973, at *1 (E.D. Pa. Mar. 16, 2009)).[14]

---

[14] On March 16, 2009, the United States District Court for the Eastern District of Pennsylvania found Petitioner "incompetent to stand trial" and ordered that Petitioner be "commit[ted] . . . to the custody of the Attorney General for release to the appropriate state official or to hospitalize [Petitioner] . . . for treatment in a suitable facility."  *Jackson*, 2009 WL 691973, at *3.  On January 14, 2011, the Eastern District of Pennsylvania ordered Petitioner be discharged from custody.  *Jackson*, No. 03-173-04, Dkt. No. 386.

That Petitioner had a history of mental illnesses, however, is insufficient to prove that Clinton County Court's failure to further inquire into Petitioner's competence denied him a fair trial.

As explained above, in determining whether a hearing to further inquiry into Petitioner's competency was warranted, Clinton County Court was "required to consider only that evidence actually before it[.]" *Nicks*, 955 F.2d at 169 (emphasis added). Significantly, the record lacks any indication that evidence of Petitioner's history of mental health issues or the 2009 finding of incompetence were put before Clinton County Court. Petitioner has not alleged, either in support of his application for coram nobis relief or in the instant action, that the trial court was aware of his history of mental illness. *See* Dkt. No. 49-4 at 44-48; Am. Pet. at 9-11. Indeed, at the May 5, 2015, hearing– conducted for the purpose of confirming Petitioner's intent to proceed pro se – Petitioner informed the court, as a part of its colloquy, that he had previously appeared before courts in "New York, Downstate, . . . [and] Pennsylvania" but did not explain the disposition of the Eastern District of Pennsylvania case. Dkt. No. 49-5 at 250.

Furthermore, the Eastern District of Pennsylvania's March 16, 2009, conclusion that Petitioner was not competent to stand trial occurred more than six years before Petitioner's June 2015, jury trial. *Jackson*, 2009 WL 691973, at *10. "The question of competency to stand trial is limited to the defendant's abilities *at the time of trial*[.]" *Vamos*, 797 F.2d at 1150 (emphasis added) (citing *United States v. Makris*, 483 F.2d 1082, 1091 (5th Cir. 1973), *cert. denied*, 415 U.S. 914 (1974)). Accordingly, the fact that Petitioner had been deemed incompetent to stand trial in 2009, without more, does

not prove Clinton County Court erred in failing to conduct a formal inquiry into

Petitioner's competence.

Additionally, "[i]t is well-established that some degree of mental illness cannot be

equated with incompetence to stand trial." *Vamos*, 797 F.2d at 1150-51 (2d Cir. 1986)

(citing *Hall v. United States*, 410 F.2d 653, 658 (4th Cir. 1969), *cert. denied*, 396 U.S.

970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969)).  "The mental illness must deprive the

defendant of the ability to consult with his lawyer 'with a reasonable degree of rational

understanding' and to understand the proceedings against him rationally as well as

factually." *United States v. Nichols*, 56 F.3d 403, 412 (2d Cir. 1995) (quoting *Dusky*,

362 U.S. at 402); *see also e.g.*, *Davis v. Keane*, 45 F. App'x 31, 32-33 (2d Cir. 2002)

(Summary Order) (holding "[n]o clearly established Federal law . . . indicates that [the

petitioner]'s low I.Q. and history of mental impairment alone required the trial court *sua*

*sponte* to order a competency hearing" and petitioner's "counsel did not act

unreasonably when he did not move for a competency hearing[.]").  Therefore, even if

Clinton County Court had been provided evidence of Petitioner's history of mental

health issues, further inquiry into Petitioner's competence may not have been

warranted.  *See, e.g.*, *Alexis v. Griffin*, No. 1:11-CV-5010, 2014 WL 3545583, at *17

(S.D.N.Y. July 18, 2014) (concluding "the mere fact that [the petitioner] suffered from a

mental illness that required him to be hospitalized for a brief period did not preclude [the

trial court] from determining that an additional competency hearing was unnecessary.");

*report and recommendation adopted*, 2014 WL 5324320 (S.D.N.Y. Oct. 20, 2014);

*Smith v. Lempke*, No. 6:08-CV-6065, 2010 WL 2629794, at *6-7 (W.D.N.Y. June 28,

2010) (rejecting the petitioner's "claim[] that the state court erroneously failed to inquire

38

into his competence prior to trial and sentencing" noting "a defendant's history of mental impairment alone does not require the trial court *sua sponte* to order a competency hearing.") (citing *People v. Tortorici*, 92 N.Y.2d 757, 765 (1999) (a "defendant's history of psychiatric illness does not in itself call into question defendant's competence to stand trial.")) (additional citations omitted).

Finally, as identified by Respondent, none of the three attorneys tasked with representing Petitioner prior to his waiver of counsel called Petitioner's competency into question or moved for a competency examination.[15]  Courts in this district have concluded "[t]he fact that trial counsel never moved for a competency examination and never called petitioner's competency into question . . . indicates petitioner's competence."  *Mosby v. O'Meara*, No. 9:12-CV-1543 (FJS/ATB), 2015 WL 4871803, at *8 (N.D.N.Y. Aug. 13, 2015) (citing *Pate*, 383 U.S. at 391); *see also Chicherchia v. Griffin*, No. 9:16-CV-1027 (NAM/ATB), 2017 WL 9511171, at *8-9 n.6 (N.D.N.Y. May 22, 2017) (rejecting the argument that the trial court should have conducted a competency hearing because of the petitioner's "history of mental illness" and "multiple verbal outbursts prior to and during the trial" and explaining "[t]he fact that petitioner's legal

---

[15] At Petitioner's arraignment, Clinton County Court appointed Mr. Michaud as counsel.  Dkt. No. 49-5 at 3.  In a letter dated August 4, 2014, Petitioner "inform[ed] the [trial] court[] that [he was] firing Mr. Michaud as [his] attorney[.]"  Dkt. No. 49-1 at 49.  Clinton County Court relieved Mr. Michaud on August 12, 2014.  Dkt. No. 49-5 at 12.  Thereafter, Petitioner hired Mr. Norfolk as counsel, who first appeared on Petitioner's behalf on September 16, 2014.  Dkt. No. 49-5 at 15.  Mr. Norfolk asked the trial court to be relieved prior to the February 24, 2015, hearing, during which Petitioner stated he had no objection to Mr. Norfolk's request.  Dkt. No. 49-5 at 26-28.  Clinton County Court Ordered Mr. Norfolk be relieved as counsel on February 27, 2015, and adjourned the proceedings for Petitioner to obtain representation.  Dkt. No. 49-1 at 52; Dkt. No. 49-5 at 29-31.  Following Mr. Norfolk's discharge, Petitioner asked the trial court that he, being "competent with a sound mind [and] very capable of representing [himself] in this matter[,]" be allowed to proceed with a "co-counsel of [his] choosing."  Dkt. No. 49-1 at 53.  At a hearing on March 11, 2015, Petitioner asked the trial court to appoint new counsel.  Dkt. No. 49-5 at 49.  Accordingly, Clinton County Court appointed Mr. Anderson as counsel, who entered his appearance before the court on March 13, 2015.  Dkt. No. 49-5 at 60.  At the conclusion of the *Huntley*/*Wade*/*Mapp* hearing on April 24, 2015, Clinton County Court relieved Mr. Anderson.  Dkt. No. 49-5 at 221.

counsel did not express any doubts about [petitioner's] competency during the proceeding is a valid factor for the court to consider."), *report and recommendation adopted*, 2017 WL 2819816 (N.D.N.Y. June 29, 2017); *Rodriguez v. Lamanna*, No. 2:18-CV-07196, 2020 WL 4926358, at *4 (E.D.N.Y. Aug. 19, 2020) (concluding the petitioner's claim "that his guilty plea was not knowing, voluntary, and intelligent because the trial court did not inquire into his mental capacity" did not warrant federal habeas relief and observing "quite significantly, as the record memorializes, neither of the two lawyers who appeared on behalf of [the petitioner] suggested that [petitioner] was incompetent to stand trial . . . nor did either of them at any time . . . request that a competency hearing be ordered.").  Here, that none of the attorneys who served as counsel for Petitioner raised the issue of Petitioner's competence provides further support for the conclusion that Petitioner had a rational understanding of the proceedings during which he was represented and, accordingly, that further inquiry into the subject was not warranted.

### ii.    Petitioner's Use of Medications

Petitioner also argued appellate counsel should have raised the trial court's failure to assess Petitioner's capacity to waive the right to trial counsel because he "was taking medication during trial and after trial[] for Bipolar Depression" because he "ha[d] been diagnose[d] with a mental defect, which includes symptoms of: Paranoid Ideation, hallucinations, Bipolar affective disorder, and Schizophrenic disorder."  Dkt. No. 49-4 at 48 (citing *Jackson*, 2009 WL 691973).

As previously stated, evidence of the Eastern District of Pennsylvania's 2009 Order finding Petitioner incompetent was not presented to Clinton County Court at the

time of Petitioner's trial.  Therefore, the trial court was under no obligation to consider the diagnoses in the aforementioned order, which was not before it.  *See Nicks*, 955 F.2d at 169.

Prior to trial, Petitioner filed a motion requesting release on his own recognizance or bail, dated April 10, 2015, wherein Petitioner argued he should be released "due to[, *inter alia*,] the extreme . . . mental stress of being incarcerated."  Dkt. No. 49-2 at 61.  In a subsequent letter to the trial court, dated April 15, 2015, Petitioner asked the court to "release [Petitioner] on his own recognizance" because the People and the trial court "ha[d] eroded [Petitioner's] Due Process [rights], and cause[d] significant[] damage to [Petitioner's] mental state[.]"  *Id*. at 62.  Petitioner averred he "ha[d] high blood pressure, which [he] t[ook] medication for" and took a "prescri[ption] medication (Prozac) for anxiety[] and deep depression."  *Id*.  Because Petitioner's use of "Prozac" was "actually before" Clinton County Court, the trial court was obligated to consider that fact in determining whether further inquiry into Petitioner's competence was required.

However, Petitioner's use of "Prozac[] for anxiety[] and deep depression" did not require Clinton County Court to inquire into his competence to waive the right to counsel and proceed to trial.  *See, e.g.*, *Lopez v. Walker*, 239 F. Supp. 2d 368, 374-75 (S.D.N.Y. 2003) (rejecting the petitioner's argument that the trial court "err[ed] in failing to inquire into [his] competency[,]" despite the petitioner's "prior suicide attempts, hospitalization, and use of the drug Sinequan" because "[t]his evidence alone did not require the [state] court to make a further inquiry into [the petitioner]'s competency to stand trial[.]"); *Rodriguez*, 2020 WL 4926358, at *4 ("[t]he trial court's decision to go forward without ordering a competency hearing was not inappropriate" because "[a]lthough [a] report

detailed [the petitioner's] history of prior hospitalizations, mental health therapy, suicide attempts, and use of psychiatric medication, this evidence alone does not trigger a right to a competency hearing when, otherwise, there is no indication of incompetence."); *see also, e.g.*, *Cohn v. United States*, No. 1:19-CR-0279 (LEK), 2023 WL 4670839, at *13 (N.D.N.Y. July 10, 2023) (concluding "it was not an abuse of discretion to refrain from sua sponte ordering a competency hearing" despite evidence of the petitioner's "extensive history of mental illness" and "use of several medications to manage his mental health issues, including 'Zoloft (an antidepressant which can also be used to treat anxiety disorders, post-traumatic stress disorder, and other conditions), Buspar (an anti-anxiety medication), Clozapine (used to treat schizophrenia), and Trazadone (an antidepressant).'").

Petitioner did not allege his use of "Prozac" during trial impaired his ability to understand the proceedings.  *See e.g.*, *Munck v. Amoia*, No. 9:16-CV-0118 (GLS), 2016 WL 4275737, at *4 (N.D.N.Y. Aug. 12, 2016) (petitioner claimed his entry of a "guilty plea was unknowing, involuntary and unintelligent because" at the time, the petitioner "suffer[ed] from bipolar disorder and . . . was taking several medications" which "tend[ed] to impair his concentration and understanding.") (internal quotations omitted); *Roman v. Cunningham*, No. 04-CV-1093, 2005 WL 1796122, at *2 (E.D.N.Y. July 27, 2005) (petitioner argued, in a motion to vacate his judgment of conviction, "that his plea was not knowing and voluntary because he was 'under the influence of various medications' that impaired his ability to understand the proceedings.")  Instead, Petitioner appears to argue his use of medication to treat mental health issues evinces he should not have been permitted waive his right to trial counsel.  Dkt. No. 49-4 at 48.

Petitioner's argument is unpersuasive, however, as "some degree of mental illness cannot be equated with incompetence to stand trial."  *Vamos*, 797 F.2d 1150-51. Therefore, the fact that Petitioner utilized medication to treat symptoms of a mental illness during the pre-trial and trial proceedings did not require the court to inquire into his competence to waive trial counsel.  *See, e.g.*, *Lopez*, 239 F. Supp. 2d at 374-75.

### iii.    Petitioner's Behavior

Finally, Petitioner argued appellate counsel's failure to raise the issue of his mental capacity constituted ineffective assistance because Petitioner "had a few outburst[s] with [the] trial judge[.]"  Dkt. No. 49-4 at 46.  Petitioner cited two exhibits in support of this argument: a portion of the transcript from the May 5, 2015, hearing and a portion of the transcript from the *Huntley*/*Wade*/*Mapp* hearing which took place on April 23-24, 2015.  *See id*. at 73-88.[16]

In the portion of the *Huntley*/*Wade*/*Mapp* hearing cited by Petitioner, Clinton County Court first acknowledged the appointed counsel's report that Petitioner wished to terminate counsel's representation of him then informed Petitioner that if he wished to proceed pro se, Petitioner would be required to abide by the same rules of evidence and decorum as an attorney.  Dkt. No. 49-5 at 216.  Petitioner requested "a Court Order for [handwriting] samples from [Investigators] TJ Connolly and Sue Ewing[, because] TJ Connolly forged those documents[.]"  *Id*. at 216-17.  The court asked Petitioner to elaborate and Petitioner explained his theory that "the confidential informant didn't pick [him] out" as the individual who sold the CI drugs.  *Id*. at 217.  The court asked how the CI's signature related to the discovery of "drugs . . . in [petitioner's] suitcase" and

---

[16] *See also* Dkt. No. 49-5 at 65-222 (Transcript April 23-24, 2015), 240-59 (Transcript May 5, 2015).

Petitioner answered the police were "trying to base everything off of th[e traffic] stop. The reason why they stopped me on June 11th was because I made sales [to the CI] in the past [in] March and April[.]"  *Id.*

The trial court stated "12 jurors" would be the ones to "make a determination as to [the] credibility" of the document and "whether that was signed properly or not, can the police/People prove that [Petitioner] possessed drugs on the occasion that [he] was arrested? . . . That's the whole issue. I don't understand how that plays."  Dkt. No. 49-5 at 218.  Petitioner began to respond, explaining that if the documents related to the March and April sales had been forged, but the court interjected that the documents at issue were not forged, to which Petitioner asserted, the "signatures [were] totally different[.]"  *Id.* at 218-19.  The trial court explained the documents were "subject to proof[,]" Petitioner stated he had hired a forensic scientist, and the following colloquy ensued:

|  |  |
|---|---|
| The Court: | A jury is going to have to decide whether -- |
| [Petitioner]: | Why does a jury got to decide if that's proof? A real judge would just give a sample so I don't have to go through this. This is [sic] violating my rights. You just sat here and just said it don't solve nothing if you forge those documents or somebody else signed for the confidential informant. |
|  | I don't know which Constitution you live under, but that is not New York State or United States Constitution. That is a Fourth Amendment [violation] of the due process. |
| The Court: | When you get your law degree, you tell me more about it. |
| [Petitioner]: | You're right, Mr. biased Judge. |

*Id*. at 219.  The court announced the matter was adjourned, but Petitioner continued, requesting a "hearing for police misconduct and prosecut[orial] misconduct" and "a court order."  *Id*. at 220.

Clinton County Court stated there was "absolutely no proof" of misconduct in the matter, but Petitioner argued "[t]he signatures [we]re forged" and the "forensic scientist said they were forged; they are different from one another. He clearly stated it's not signed by one person[.]"  Dkt. No. 49-5 at 220.  The court repeated that the matter was adjourned and Petitioner responded "[t]hat's okay, but I'm going to keep writing that Appellate Division, the Third Department[,] until I get it. I will get it."  *Id*.  The court explained that Petitioner could continue writing, but his request for a hearing would not be granted.  *Id*.  Petitioner responded "[y]eah, I will, Mr. biased Judge. I will. I will. I promise. No, Mr. McGill, you're wrong. You just said it's okay to forge a document. That's what you just said. Did I hear that right?" then exited the courtroom.  *Id*. at 220-21.

The May 5, 2015, hearing began with Clinton County Court's declaration of its intent to seek assurance that Petitioner wish to proceed pro se.  Dkt. No. 49-5 at 241. The court asked whether Petitioner so wished, Petitioner answered "[u]h huh[,]" and the trial court instructed Petitioner to answer verbally to assist the court reporter.  *Id*. Petitioner refused to respond when the trial court asked whether he planned to speak and "what stage the[] proceedings [we]re at[,]" but when the trial court asked Petitioner if he "kn[e]w what the next step in the[] proceedings [wa]s[,]" Petitioner responded that he "sent in a motion for handwriting samples of the parties involved."  *Id*. at 241-42.

45

Clinton County Court acknowledged receipt of Petitioner's motion and explained a hearing might be necessary to clarify what relief Petitioner had requested because, if the matter was merely one of impeachment, the proper redress would be questioning at trial; however, "[i]f it [wa]s a due process issue, then the question becomes . . . whether that was so heinous . . . [that the allegation amounted to] a violation of [Petitioner's] due process rights[.]"  Dkt. No. 49-5 at 242-43.  Petitioner responded the issue was "a due process violation," the court permitted him to continue, and Petitioner explained:

> The Police Officer, Timothy J. Connelly, forged the CIB number of the confidential informant. That is a violation. That is a manufactured crime. He is not entitled to forge or falsify reports to get a conviction. So basically by him getting on the stand, lying under oath, he tainted the case. So counts one through nine should be dismissed on the Poisonous Tree Doctrine. Because Investigator Joey Rice took those allegations of drug buys undisposed to Judge Pattenode to get a search warrant to search my vehicle. In fact, Joey Rice testified at the Mapp Hearing that he called Investigator -- no, Trooper Brian Karen to be on the lookout for a 2007 Infinity.

*Id*. at 243.  The court began to interject, but Petitioner continued:

> Basically what I'm saying is Timothy Connelly as some human lied under oath. Timothy Connelly signed the CIB number, which is a clear violation because it clearly states witnesses must sign. And I clearly asked for it, for these samples a long time ago. I br[ought] this to your attention on March 9th. Matter of fact, your words w[ere] it would be a battle of the experts. Now the People are reluctant to -- the People are entitled to get their own experts to rebut[] these allegations.

*Id*. at 244.

The court interjected, instructing Petitioner that the purpose of the hearing was "to determine whether [Petitioner] ha[d] knowingly and intelligently decided to proceed pro se."  Dkt. No. 49-5 at 244.  Petitioner answered "Yes, I d[id]."  *Id*.  Clinton County Court reminded Petitioner he would be required to abide by the rules governing the

presentation of evidence at trial and asked Petitioner if he had "ever represented

himself in court before?[.]"  *Id.* at 245.  Petitioner did not answer the question, rather, the

following colloquy ensued:

> [Petitioner]:  Mr. Judge McGill, I just want to be clear about this: If Timothy Connelly did this heinous act, there won't be no trial and there shouldn't be no trial, because that's fruit from the poisonous tree all the way through for --
>
> The Court:  Mr. Jackson, there are cases that deal with this issue . . . and if the fact pattern is as I understand it, I'm not sure it meets that criteria . . . If you take the signature out of this entire mix, the issue then becomes one of whether there was any kind of basis upon which to stop and arrest you. And as I read the case law, they were entitled to stop you. If you violated a traffic infraction, they were entitled to stop you and they were also entitled to do a sniff around which forms the basis of the search warrant regardless of your prior --
>
> [Petitioner]:  Okay. What was the probable cause to do a free air sniff and --
>
> The Court:  There's no probable cause necessary.
>
> [Petitioner]:  Okay. What was the reason for him calling [Brian Caron] to be on the lookout for a 2007 Infinity? Is that racial profiling? Why?
>
> The Court:  Racial profiling?
>
> [Petitioner]:  Okay. Why is he on the lookout for a 2007 Infinity? He stated because [Petitioner was] under investigation and he ha[d] suspicion to believe that [Petitioner was] carrying drugs.
>
> The Court:  Right.
>
> [Petitioner]:  What is he basing this off from?
>
> The Court:  It doesn't make any difference. He doesn't have to have a basis to do an investigation.
>
> [Petitioner]:  Why is he on the lookout for a 2007 Infinity?
>
> The Court:  Because he was investigating the suspicion that there was a crime afoot.
>
> [Petitioner]:  How d[id] he know this?
>
> The Court:  Because he said so.
>
> [Petitioner]:  Oh, because he said so. So basically pick a nigger off the highway, be on the lookout for, right?

| The Court: | This does not have anything to do with -- |
| [Petitioner]: | Because they investigated me for drugs -- |
| The Court: | Mr. Jackson, Mr. Jackson -- |
| [Petitioner]: | -- April 28th, April 30th -- |
| The Court: | -- Mr. Jackson -- |
| [Petitioner]: | -- and that's the forged documents. |
| The Court: | -- Mr. Jackson, do you think you're the first or only person who's been stopped in this manner? |
| [Petitioner]: | Oh, I know you all been stalking niggers like it's okay, like you think it's 1776 or something or 1950 or 1930. |
| The Court: | You've been watching too much TV. |
| [Petitioner]: | No, I haven't been watching nothing, Mr. McGill. If Timothy Connelly forged this signature, counts one though nine should be dismissed. |

*Id*. at 246-48.  The prosecutor requested to respond and the court granted the request.

*Id*. at 248.

Following the People's response, the trial court– in a portion of the transcript which was excluded from Petitioner's application for coram nobis relief –ensured that Petitioner's waiver of the right to counsel was knowingly and intelligently made.  Dkt. No. 49-5 at 249-53.  Following a series of questions, Clinton County Court announced it was satisfied with Petitioner's responses and adjourned the proceedings.  *Id*. at 253.[17]

As previously stated, a defendant's "demeanor" or any evidence of "irrational behavior" are "relevant in determining whether further inquiry [into the defendant's fitness to proceed] is required[.]"  *See Drope*, 420 U.S. at 180 (citation omitted).  However, "[a] defendant's odd or even bizarre behavior will not trigger a trial court's duty to order a competency examination or hearing as long as it does not indicate that the defendant is unable to understand the proceedings or communicate with defense

---

[17] After the trial court's declaration, the People raised the issue of its intent to use audio and video recordings at trial and an appearance was scheduled for the purpose of allowing Petitioner to view and listen to the recordings.  Dkt. No. 49-5 at 253-55.  Thereafter, Petitioner asked the court to lower his bail, but the request was denied.  *Id*. at 255-58.

counsel." *Castrillo v. Breslin*, No. 1:01-CV-1284, 2005 WL 2792399, at *8 (S.D.N.Y. Oct. 26, 2005) (citing *Kemp v. Conway*, No. 1:03-CV-5439, 2005 WL 107096, at *4 & n.9 (S.D.N.Y. Jan. 14, 2005); *Galandreo v. Perlman*, No. 1:02-CV-6799, 2003 WL 23198790, at *19-20 (E.D.N.Y. Oct. 31, 2003), *aff'd*, 115 F. App'x 514 (2d Cir. 2004)).

Here, neither of the colloquies which Petitioner cites as evidence of his incompetence suggest he was unable to understand the proceedings. On the contrary, Petitioner's statements at both hearings demonstrated a detailed knowledge of the facts of the case and were responsive to questions asked by the trial court. *See, e.g.*, *Hoornweg v. Smith*, 504 F. Supp. 1189, 1192 (W.D.N.Y. 1981) (explaining the state court records lacked facts which should have caused the trial court to question the petitioner's competency because, "[a]lthough curt, petitioner's replies [to the court's questions] . . . were coherent, consistent and directly responsive to [the] Judge . . . [and n]o hesitation or lack of comprehension by petitioner [we]re manifested in the records."); *Cohn*, 2023 WL 4670839, at *18 (explaining the petitioner's "conduct during the proceedings evinced an ability to understand the proceedings and to participate in his own defense" where "during the proceedings against him, Petitioner was able to cogently . . . answer questions about his background, experience, education, and . . . otherwise appropriately answer the questions directed toward him[.]") (citing *United States v. Kerr*, 752 F.3d 206, 216 (2d Cir. 2014), *as amended* (June 18, 2014); *United States v. Quintieri*, 306 F.3d 1217, 1233 (2d Cir. 2002); *Saddler v. United States*, 531 F.2d 83, 86 (2d Cir. 1976)); *Qualls v. United States*, No. 1:06-CV-5852, 2021 WL 2986707, at *6 (E.D.N.Y. July 15, 2021) (rejecting the petitioner's argument that his colloquy with the trial court indicated he was not competent to proceed noting, "[m]ost

importantly, there was nothing in Petitioner's responses to the Court that indicated he was incompetent to stand trial.").

While Petitioner's conduct in referring to the trial court as "Mr. biased Judge" and suggestion that law enforcement had been "stalking" him prior to his arrest evinced a lack of concern for or disregard of the decorum typical for such proceedings, Petitioner's statements did not demonstrate an *inability to understand the proceedings* requiring the trial court to further inquire into his fitness to proceed.  *See, e.g.*, *Gouvatsos v. Ercole*, No. 1:09-CV-1449, 2012 WL 3685977, at *15 (E.D.N.Y. Aug. 23, 2012) ("petitioner's occasional outbursts during trial were insufficient to give the trial court or defense counsel reasonable cause to believe that petitioner may not have been competent to stand trial."); *Hernandez v. Senkowski*, No. CV 98-5270 RR, 1999 WL 1495443, at *26 (E.D.N.Y. Dec. 29, 1999) (rejecting the petitioner's claim that "that due process required the trial court to order [a competency] examination sua sponte" as both procedurally barred and without merit because the record demonstrated the petitioner "was an active participant in his defense" and "his own testimony demonstrate[d] his clear understanding of the proceedings and the charges against him" despite the petitioner's apparent "total disrespect for the criminal justice system" and "incorrigibility[.]").

Moreover, to the extent Petitioner contends his pre-trial insistence that both the appearance of the CI's signature on an identification document and insufficient probable cause required dismissal of some or all of the charges against him was irrational, "[t]he Supreme Court has made clear that the *ability* to represent oneself, i.e., 'technical legal knowledge,' has no bearing on a defendant's competence to choose self-representation." *Rosado v. Capra*, No. 9:09-CV-0676 (JKS), 2012 WL 4062824, at *7

(N.D.N.Y. Sept. 14, 2012) (quoting *Godinez*, 509 U.S. at 399-400) (emphasis in original).  Therefore, any misunderstanding of state or federal constitutional law is distinguishable from an inability to comprehend the proceedings.

In sum, Petitioner's claim that the trial court erred in failing to further inquire into his competence to waive the right to counsel is unsupported by the record.  Therefore, appellate counsel's failure to raise the issue in Petitioner's direct appeal did not amount to ineffective assistance.  *See United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) (explaining counsel's "failure to make a meritless argument does not rise to the level of ineffective assistance[.]") (*United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir. 1992), *cert. denied*, 506 U.S. 979 (1992)).  Accordingly, petitioner has failed to establish "cause" for the procedural default of this claim.[18]

Alternatively, there is an exception to the procedural bar in cases where a petitioner can prove actual innocence.  *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also House v. Bell*, 547 U.S. 518, 536-39 (2006) (explaining "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt[.]'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  However, Petitioner has failed to allege, much less prove, he is actually innocent.  Therefore, federal habeas review of this claim is barred.  *Coleman*, 501 U.S. at 750.

## V.    CONCLUSION

---

[18] *See Galusha v. Duncan*, No. 9:02-CV-1602 (DNH/GJD), 2007 WL 4198272, at *14 (N.D.N.Y. Nov. 21, 2007) (explaining that,  "[b]ecause Petitioner ha[d] not demonstrated cause for his procedural default, the court need not decide whether he has suffered prejudice as the result.") (citing *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997)).

**WHEREFORE**, it is:

**RECOMMENDED**, that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**ORDERED**, that the Clerk of the Court shall provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**RECOMMENDED**, that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[19] and it is further

**RECOMMENDED**, that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (FED. R. APP. P. 22(b)); and it is further

**ORDERED**, that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**</u>. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).[20]

---

[19] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

[20] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. <u>See</u> FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on

Dated: September 11, 2023
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).